IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: ) | |
| ) | |
| RODERICK WAYNE HOLMES, ) | Case No. 03-43826-drd-7 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| RODERICK WAYNE HOLMES, ) | Adversary No. 04-5059 |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| NCO FINANCIAL SYSTEMS, INC., et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION

Roderick Wayne Holmes ("Debtor") filed a complaint seeking a determination that his student loan debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(8) on the ground that repayment of such debt would impose upon him an undue hardship, which allegations defendant Missouri Student Loan Program ("Defendant") denied. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I find that Debtor's student loan debt is not dischargeable pursuant to § 523(a)(8).

I. FACTUAL BACKGROUND

Debtor obtained student loans issued by Student Loan Servicing Center/Missouri Higher Education Loan Authority ("SLSC/MOHEALA"), MOHEALA and Student Loan

Service/Commerce Bank to fund a portion of his education at Central Methodist College. He received a Bachelor of Arts in Communications in May 1992. Subsequently, Debtor obtained a consolidation loan from MOHEALA and executed a promissory note on October 5, 1993. On December 15, 1993, Missouri Student Loan Program ("MSLP") guaranteed the consolidation loan. On or about January 15, 2001, MSLP purchased the student loan from MOHEALA. As of October 25, 2004, Debtor is indebted to MSLP in the amount of $63,205.65, and has defaulted on the loan.

On June 17, 2003, Debtor filed a bankruptcy petition under Chapter 7. He received a discharge on September 25, 2003. On June 22, 2004, Debtor filed a Complaint to Determine Dischargeability regarding the student loan at issue. On July 14, 2004, MSLP, among others, was added as a defendant, and filed an answer on July 23, 2004. A trial was held on the Complaint on November 4, 2004.

## II. DISCUSSION

### A. Undue Hardship

Debtor contends that it would be an undue hardship for him to repay the remaining amount due on his student loan. Under § 523(a)(8), certain student loans are nondischargeable unless repayment of the loan would impose an undue hardship on the debtor or his dependents. The burden of establishing undue hardship, by a preponderance of the evidence, is on the debtor. *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir. 1981); *Ford v. Student Loan Guarantee Found. of Arkansas (In re Ford)*, 269 B.R. 673, 675 (B.A.P. 8th Cir. 2001). Unfortunately, the Code contains no definition of the phrase "undue hardship" and interpretation of the concept has been left to the courts. In this Circuit, the

applicable standard is the "totality of the circumstances" test. *Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003); *Andrews*, 661 F.2d at 704; *see also, Fahrer v. Sallie Mae Servicing Corp. (In re Fahrer)*, 308 B.R. 27, 32 (Bankr. W.D. Mo. 2004). In applying this approach, the courts are to consider: (1) the debtor's past, current and reasonably reliable future financial resources; (2) the reasonable necessary living expenses of the debtor and the debtor's dependents; and (3) other relevant facts and circumstances unique to the particular case. *Long*, 322 F.3d at 544; *Ford*, 269 B.R. at 676. The principal inquiry is to determine whether "the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt – while still allowing for a minimal standard of living"; if so, the indebtedness should not be discharged. *Long*, 322 F.3d at 554. The Court must determine "whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on her student loan without reducing what the debtor and her dependents need to maintain a minimal standard of living." *In re Andresen,* 232 B.R. 127, 139 (B.A.P. 8th Cir. 1999); *accord Long*, 322 F.3d at 554-55.

The "totality of the circumstances" is obviously a very broad test, giving the Court considerable flexibility. As a result, courts in the Eighth Circuit have looked to a number of facts and circumstances to assisting them in making this determination including: (1) total present and future incapacity to pay debts for reasons not within the control of the debtor; (2) whether the debtor has made a good faith effort to negotiate a deferment or forbearance of payment; (3) whether the hardship will be long-term; (4) whether the debtor has made payments on the student loan; (5) whether there is permanent or long-term disability of the debtor; (6) the ability of the debtor to obtain gainful employment in the area of the study; (7) whether the debtor

has made a good faith effort to maximize income and minimize expenses; (8) whether the dominant purpose of the bankruptcy petition was to discharge the student loan; and (9) the ratio of student loan debt to total indebtedness. *Vermaas v. Student Loans of North Dakota (In re Vermaas)*, 302 B.R. 650, 656-57 (Bankr. D. Neb. 2003); *Morris v. Univ. of Arkansas*, 277 B.R. 910, 914 (Bankr. W.D. Ark. 2002). Applying the totality of the circumstances test to the instant case, the Court examines each factor separately.

B.  Analysis of the Totality of the Circumstances

1.  Past, Present and Reasonably Reliable Future Financial Resources

The first factor the Court must consider is Debtor's past, present and reasonably reliable future financial resources. Debtor is employed by Ford Motor Company as a hood deck fitter. He has been employed by Ford since March 27, 1995, and is paid $26.45 per hour. Debtor testified that he works an average of 38 hours per week. The pay statement that Debtor submitted showed net weekly income of $529.89; however, that statement was for a short week in which Debtor worked only 24.4 hours.[1] The Court used the income figures provided in the pay statement and calculated that Debtor would earn net weekly wages of approximately $838.99 for a 38 hour week. Multiplying that figure by 52 weeks yields $43,627.48 for yearly wages, which translates to a current average monthly income of $3,635.62. Although Debtor says his employer may be cutting back on overtime, the Court's calculation of his income does not assume overtime. In addition, Debtor testified that he may receive modest increases in hourly wages in the future as the union negotiates such increases with his employer. He also testified that in the past he has received bonuses. Debtor has been employed at Ford Motor

---

[1] Defendant's Ex. 5.

Company since March 27, 1995[2], and did not indicate that there is any reason for the Court to find that his employment situation will substantially change.

On July 5, 2003, Debtor married Sharon Heath. She is a branch manager for First National Bank of Missouri. An earnings statement for her job, for the earnings period ended August 15, 2004, shows she earned $1,295.41 in net pay[3]. Debtor testified that his spouse is paid twice a month. Thus, her net monthly earnings total $2,590.82. Combining the net monthly income for Debtor and his spouse yields a net monthly household income of $6,226.14. *See In re Sweeny*, 304 B.R. 360 (D. Neb. 2002) (court must consider spouse's income in determining undue hardship). Debtor testified that his wife has been at her job for only a short period of time and that he did not know if she would be able to retain such employment. However, Debtor did not produce any evidence to warrant a finding that she will not continue to contribute income through this employment.

Furthermore, the Court notes that the amount it has calculated for Debtor's net monthly household income may be conservative. First, it does not include substantial tax refunds that Debtor has received in each of the previous two years. The evidence was that Debtor received combined federal and state tax returns of approximately $7,000 in both 2002 and 2003. If Debtor receives similar refunds in the future or adjusts his withholdings, the household could realize more than $500 in additional monthly income. Debtor testified that those returns were filed before he was married and that he believes that situation may change. He provided, however, no evidence to permit the Court to determine to what extent that might be the case.

---

[2]Def.'s Ex. 1, ¶ 13.

[3]Def.'s Ex. 6.

Secondly, Debtor is presently supporting three stepchildren toward whose expenses the biological parents, other than his current wife, contribute nothing. In his answers to Defendant's interrogatories, however, Debtor indicated that he has some reason to believe that situation may change, stating that he has been advised that he may expect to receive the sum of $112 per month for the support of Keisha Butler.[4] Although Debtor testified that he has not yet begun to receive those payments, they might be received in the future. Finally, Debtor has earned significant income in previous years as reflected by the tax returns for the years 2002 and 2003 which indicate that Debtor earned adjusted gross income in those two years, respectively, of $51,775 and $56,314.[5] According to Debtor's own admission, his adjusted gross income with his wife's current employment is approximately $86,665 per year.[6]

2. Reasonable Necessary Living Expenses

The second factor the Court must look at is Debtor's reasonable living expenses. Six children reside in Debtor's home, three of his own and three of his spouse's from a prior marriage. One of Debtor's step-daughters was recently enrolled at Sylvan Learning Center in an effort to increase her reading level to her grade level in school. The total of the monthly expenses listed in the stipulation submitted by the parties at the trial was $5,349, including the mortgage payment and two car payments.[7] This sum does not appear to include the expense of the contract with the Sylvan Learning Center for providing counseling and assistance to Debtor's

---

[4] Def.'s Ex. 9.

[5] Def.'s Exs. 7 & 8.

[6] Def.'s Ex. 9.

[7] Def.'s Ex. 1.

step-daughter to improve her reading level. On cross-examination, however, Debtor admitted that a less expensive alternative was available to him with the Sylvan Learning Center which would have provided similar services for the benefit of his daughter and cost only $304 per month. Including that expense, the household's monthly expenses are approximately $5,653. Based on Debtor's net monthly household income and monthly household expenses, the household has disposable income of $573.14 per month, which could be used to repay Debtor's student loans.

The Court also questions certain expenses reflected in the stipulation. For example, the household has combined monthly expenses for telephone, cellular phones, cable and internet of $290 per month. This appears excessive, and probably could be cut in half. Defendant raised an issue about the household's monthly food expenses. Food expenses are estimated to be $866 per month according to the stipulation. According to USDA plans for the cost of food for households of various sizes and compositions, a family like Debtor's could be expected to spend $892.26 on the least expensive of the available plans described in that chart.[8] Defendant's counsel pointed out that in addition to this expense, Debtor budgets $351 per month for meals at school which in many cases include breakfast as well as lunch and that there may be some duplication in the figures. Even if that is true, however, the household's monthly expenses for food total $1,217 which is still less than the moderate cost plan according to calculations based on the USDA figures. The Court therefore does not believe that the household's monthly food expenditures are excessive.

Although Debtor claims that the household is living paycheck to paycheck with nothing

---

[8]Plaintiff's Ex. 1.

left over, based upon the combined incomes of Debtor and his spouse and his own estimate of expenses, the household should have money left over to make payments on the student loan. If not, it is apparently due to poor money management and expenditures on items not listed in the stipulated expenses which the Court cannot therefore find to be either reasonable or necessary. For example, based on account statements on Debtor's two checking accounts, Debtor is spending approximately $198 per month at restaurants, $50 per month at liquor stores, $365 per month at New Discount Smokes, presumably on cigarettes, $262 per month on non-sufficient funds fees, $121 per month on telephone charges, and $71 per month on Direct TV.[9] With proper budgeting and belt-tightening, Debtor should be able to significantly reduce all of the noted expenses.

Based on Debtor's monthly income and expense data, with proper money management Debtor can afford to make payments on the student loan. According to the testimony of Mr. Machefts, assistant commissioner and general counsel for the Missouri Department of Higher Education, of which Defendant is a division, Debtor has a number of restructuring options available to him. In order to exercise those options, Debtor needs first to make payments in an amount which Defendant, the guarantor, considers to be "reasonable and affordable" on time each month for a period of 12 months. According to the testimony, the amount the guarantor would find to be acceptable for that purpose is $300 per month. If those payments are made, Debtor would become eligible for a plan pursuant to which the loan would be repurchased

---

[9]Def.'s Exs. 10 & 11; the Court analyzed the expenses reflected on the account statements for two checking accounts from March 8, 2004 through September 30, 2004. The Court assigned each relevant expense to one of the referenced categories and divided the total in each category by 7 months in order to calculate an approximate average monthly expense amount.

by the original lender and restructured according to one of several options. The standard repayment option plan involves paying the balance over a 30-year period at an interest rate of 8.25%, with monthly payments of $475 per month. Based upon the above described testimony with regard to the household's income and expenses, Debtor should be able to make both the monthly payments required to make him eligible for the restructuring plans and the amount of the required monthly payment under the standard repayment plan.

### 3. Other Relevant Facts and Unique Circumstances

As to the third factor the Court must evaluate, the Debtor has not presented evidence of unique facts or circumstances that the Court believes will cause an undue hardship for the Debtor to repay the student loan. Debtor is only 34 years old; his wife only 28. Both thus have significant working life ahead of them. Although Debtor complains of several health conditions or concerns, and testified that he is taking medication for high blood pressure and nausea and a sleep aid, none appear to have a major effect on his ability to earn. Although he has been diagnosed with hypertension, it is apparently controlled by medication. The only evidence about his having missed work due to this condition is his testimony that he lost two days in the week prior to trial. He nonetheless affirmed at trial his testimony during his deposition that he still works an average of 38 hours a week, upon which the Court's calculation of income is based. Debtor has a family history of diabetes and claims his doctors "fear" he may develop kidney disease, but there is no evidence that he actually has any such condition and no evidence as to what it would mean for his income or expenses if he did.

One of his children has what was described as a ventricle septic defect, a hole in her heart. Debtor testified this may require surgery, but there is no evidence that this will be

9

necessary or, if so, what it would cost or whether the costs are covered by the health insurance plan Debtor has through his employer, for which he pays no premium.

Another daughter is behind in her reading level in school and is being tested for a learning disability. Once again, there is no evidence as to how this impacts the family's financial condition other than the monthly expenditure for the services of the Sylvan Learning Center, for which, as observed above, there is apparently a less expensive alternative program available to Debtor and which the Court included in calculating Debtor's monthly expenses. Based on the evidence presented, the additional relevant facts and unique circumstances presented to the Court do not support a finding that it would be an undue hardship for Debtor to repay his student loan.

For all of the above reasons, it is

ORDERED that the indebtedness owed by debtor Roderick Wayne Holmes to defendant Missouri Student Loan Program is not dischargeable pursuant to 11 U.S.C. § 523(a)(8).

A separate Order will be entered in accordance with Bankruptcy Rule 9021.


Dated: December 27, 2004                                          /s/ Dennis R. Dow

                                                     THE HONORABLE DENNIS R. DOW
                                                     UNITED STATES BANKRUPTCY JUDGE

Copies to:

Robert Brandom
Shelley L. Forrest